1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**
9        **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11  WAGNER AERONAUTICAL, INC., et al, | Case No.: 21CV0994 L AGS |
| 12 | |
| 13                    Plaintiffs, | **(1) ORDER VACATING PRIOR SEALED ORDER [ECF NO. 373];** |
| 14            v. | **(2) AMENDED ORDER DENYING PLAINTIFFS' RE-CALENDARED MOTION FOR PRELIMINARY INJUNCTION [ECF NO. 161-1];** |
| 15  DAVID DOTZENROTH; et al, | |
| 16                    Defendants. | **(3)  ORDER DENYING DOTZENROTH DEFENDANTS' *EX PARTE* APPLICATION FOR LEAVE TO FILE SUPPLEMENTAL OPPOSITION [ECF No. 218];** |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | **and** |
| 22 | **(2) ORDER DENYING DOTZENROTH DEFENDANTS' *EX PARTE* APPLICATION FOR ENTRY OF REDACTED ORDER [ECF NO. 376]** |
| 23 | |
| 24 | |
| 25 | |
| 26 | |

27
28

        On September 29, 2022, the Court issued a sealed Order denying Plaintiffs' motion for preliminary injunction. [ECF No. 373.]  On October 6, 2022, the Dotzenroth

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendants filed an unopposed *ex parte* application for entry of redacted order denying Plaintiffs' motion for preliminary injunction. [ECF No. 376.] The Dotzenroth Defendants request that the Order be publicly filed in part to disclose the contents of the Order to their clients. Plaintiffs' counsel has no objection other than redacting two mentions of a confidential business name.  (Fitzgerald Dec. at ¶ 2 Ex, A.) The NIAR Defendants' counsel joined the request to publicly docket the redacted Order. (Fitzgerald Dec. ¶ 3, Ex B.) The Court has amended the prior sealed Order to omit the confidential name, as evidenced below. Accordingly, the Court vacates the prior Order [ECF No. 373], files the Amended Order, and denies the application to file redacted order as moot [376.]

Pending before the Court is Plaintiffs' re-calendared motion for preliminary injunction [ECF No. 161]. The Dotzenroth Defendants and NIAR Defendants filed oppositions, and Plaintiffs filed a reply.  Also pending before the Court is Dotzenroth Defendants' ex parte application for leave to file supplemental briefing in opposition to Plaintiffs' re-calendared motion for preliminary injunction.  [ECF No. 218.]  The Court has granted the parties' requests to seal the documents and their attachments. The Court decides the matter on the papers submitted and without oral argument. *See* Civ. L. R. 7.1(d.1).  For the reasons stated below, Plaintiffs' motion is denied.

## I.    FACTUAL BACKGROUND

The facts as asserted in Plaintiffs' Complaint include the following:

Plaintiff Mammoth Freighters LLC ("Mammoth" or "Mammoth Freighters") is developing a passenger aircraft conversion program, designed in part by Plaintiff Wagner Aeronautical, Inc. ("Wagner Aeronautical"), that takes passenger aircraft and modifies them to carry cargo for the world's leading air freight companies. The co-CEOs of Mammoth are Plaintiffs William Wagner ("Wagner") and William Tarpley ("Tarpley"). Wagner is the founder and president of Wagner Aeronautical and Tarpley is the business lead for Mammoth's conversion program.

2

When Wagner and Tarpley began work on the conversion program, they asked Defendant David Dotzenroth ("Dotzenroth"), a long-time friend with connections in the financial industry, if he would be interested in exploring the possibility of a collaboration whereby Wagner and Wagner Aeronautical would contribute the engineering expertise; Tarpley would contribute project management expertise and marketing expertise to attract potential clients; and Dotzenroth would secure investment capital to fund the development of the conversion program.

Plaintiffs now allege that Defendants David Dotzenroth, Charles Wiley Dotzenroth, and Andrew Mansell, along with the NIAR Defendants, stole valuable, confidential and proprietary information belonging to Plaintiffs including a business plan, budget, and schedule roadmap, in order to launch a competing business converting large passenger aircraft into cargo freighters.

The Dotzenroth Defendants purportedly shared the trade secrets with the National Institute for Aviation Research ("NIAR"), which is part of Wichita State University. The NIAR Defendants, including David Jones, Ronald Towry, and Eric Kivett, have developed a 777 Conversion Program that is currently operating. Plaintiffs seek to enjoin Defendants from using the trade secrets, and developing aircraft based on that information.

I.   PROCEDURAL BACKGROUND

On May 25, 2021, Plaintiffs filed a complaint in this Court alleging misappropriation of trade secrets under federal and state law, false advertising under the Lanham Act, unfair competition under California law, breach of fiduciary duty, and civil conspiracy. (Complaint [ECF No. 1.])  On June 21, 2021, Plaintiffs filed a motion for preliminary injunction. (Mot. [ECF No. 16.]) On July 8, 2021, Plaintiffs withdrew the motion for preliminary injunction. [ECF No. 48.] On November 9, 2021, Plaintiffs filed a First Amended Complaint, adding a claim for misappropriation against Defendant NIAR. [ECF No. 132.]  On November 23, 2021, the Dotzenroth Defendants filed a Motion to

3

Dismiss Counts Four and Five. [ECF No. 142.] By Order dated September 16, 2022, the Court granted Defendants' Motion to Dismiss. [ECF No. 369.]

On December 21, 2021, Plaintiffs filed the present motion for re-calendared preliminary injunction. [ECF No. 161-1.] The Dotzenroth Defendants filed a response in opposition on January 24, 2022. [ECF No. 201.]  On February 3, 2022, the Dotzenroth Defendants filed an ex parte application for leave to file a supplemental opposition to Plaintiffs' recalendared motion for preliminary injunction.  [ECF No. 218.] On February 4, 2022, Plaintiffs filed a response in opposition to Defendants' ex parte application for leave to file supplemental opposition, and a reply to the motion for preliminary injunction. [ECF Nos. 222, 225.]  On February 23, 2022, Defendants filed Newly Acquired Evidence in opposition to Plaintiffs' motion for preliminary injunction. [ECF No. 250.]

II.   DISCUSSION

"[P]laintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Resource Def. Council*, 555 U.S. 7, 24 (2008)(*citing Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

> [T]he elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits. [The Ninth] circuit has adopted and applied a

4

version of the sliding scale approach under which a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor. That test was described in this circuit as one alternative on a continuum.

*Alliance for the Wild Rockies*, 632 F.3d at 1131.

### A.  Likelihood of Success on Merits

Trade secret misappropriation includes "disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5)(A). Such disclosures are unlawful when they are made "by a person who at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret. *Id*.; *see* Cal.Civ.Code §3426.1(b). Similarly, under the UTSA, a plaintiff must allege two elements: '(1) the existence of a trade secret, and (2) misappropriation of the trade secret.'" *AccuImage Diagnostics Corp. v. Terarecon, Inc*., 260 F.Supp.2d 941, 950 (N.D.Cal.2003) (citing Cal. Civ.Code § 3426.1(b)). This standard has been adopted by the Ninth Circuit. *Imax Corp. v. Cinema Techs., Inc.,* 152 F.3d 1161, 1164–65 (9th Cir.1998). Plaintiffs seeking relief for misappropriation of trade secrets "must identify the trade secrets and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir.1993).

### 1.  Existence of Trade Secrets

Trade secrets include: "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes. . ." 18 U.S.C.A. § 1839(3)(A).  To prove ownership, the holder of the information must show that (1) they have "taken reasonable measures to

keep such information secret; and (2) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C.A. § 1839(3)(A).

> Similarly, CUTSA defines trade secrets as:
>
> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal.Civ.Code § 3426.1(d)(2).

As a preliminary matter, a plaintiff seeking trade secret protection "should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade." *Imax Corp. v. Cinema Technologies, Inc*., 152 F.3d 1161, 1164-65 (9th Cir. 1998); see also *Diodes, Inc. v. Franzen*, 260 Cal.App.2d 244, 67 Cal.Rptr. 19 (2d Dist.1968); *Pellerin v. Honeywell Int'l, Inc*., 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012); *see also* Cal.Civ.P. § 2019.210("the party alleging the misappropriation shall identify the trade secret with reasonable particularity.")

Here, Plaintiffs describe the alleged trade secrets as the business plan, roadmap, FAA certification schedules and descriptions, along with design specifications and drawings.  (Mot. at 9-11). The business plan was reflected in PowerPoint slide decks that described the conversion process, analyzed risks and included competitive advantage analysis and engineering details.  (*Id*. at 3).  The roadmap was a multi-tab Microsoft Excel spreadsheet that included "revenue projections, month-by-month cost estimates,

1   development costs, schedule estimates, the rate of return, program input financing,

2   staffing inputs and engineering headcounts, and other details." (*Id.*)

3       These descriptions identify broad categories of documents, but do not describe

4   what part of those documents is protectable. *See Calendar Rsch. LLC v. Stubhub, Inc.,*

5   No. 2:17-cv-04062-SVW-SS, 2020 WL 4390391, at *8 (C.D. Cal. May 13,

6   2020)("'[B]road, categorical terms' are insufficient for the Court to discern the alleged

7   trade secret.")   In addition, Plaintiffs contend that "all drafts and variations" of the

8   documents are protectible trade secrets, but this overbroad request without clear

9   identification of the contents of those documents falls short of the "reasonable

10  particularity" requirement of CCP §2019.210.

11

12      Additionally, Defendants allege that much of the information contained within

13  these documents is actually in the public domain, and therefore cannot be included as a

14  trade secret. Plaintiffs acknowledge that some of the material orignated from various

15  public sources, but argue that a compliation of data collected from various sources may

16  still qualify for trade secret protection. However, Plaintiffs do not make efforts to identify

17  the protectable information from that which may be generally known.  *See Imax Corp*,

18  152 F3d at 1164.  Plaintiffs do not provide sufficiently detailed descriptions of their trade

19  secrets for the Court to discern whether they possess ownership of the information.

20  Despite this shortcoming, the Court presumes Plaintiffs can, or have, sufficiently

21  identified the protectible portions of those documents, and proceeds to determine whether

22  a preliminary injunction is warranted.

23              *a.     Secrecy*

24      It is incumbent on the owner of trade secrets to protect the secrecy of that

25  information to retain its value. "Because of the intangible nature of a trade secret, the

26  extent of the property right therein is defined by the extent to which the owner of the

27  secret protects his interest from disclosure to others." *Ruckelshaus v. Monsanto Co*., 467

28

US. 986, 1002 (1984). "If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Id*.

Plaintiffs argue they made reasonable efforts to protect the secrecy of the alleged trade secrets by using secure IT systems to store documents, Wagner Aeronautical employees signed confidentiality agreements, Wagner Aeronautical offices were only accessible to authorized personnel, and information was provided to outsiders only on a need-to-know basis. (Mot. at 12). Plaintiffs claim they marked versions of trade secrets as "proprietary," and they obtained non-disclosure agreements with potential customers before sharing the information. (*Id*.) In addition, Plaintiffs assert that any disclosures they made did not imperil the secrecy of the trade secrets because the information did not go to competitors and did not become generally known. (Reply at 14). They also contend that there was an understanding between Wagner, Tarpley and Dotzenroth that the information was confidential and not to be divulged to outsiders.

Defendants counter that Plaintiffs shared their data without non-disclosure agreements ("NDA") in place and as a result they lost their property interest in the data because secrecy is a requisite element of a trade secret. (Dotzenroth Def. Oppo. at 14). For example, Defendants contend that neither Defendant Dotzenroth nor Defendant Wiley were bound by an NDA, yet Plaintiffs emailed all of their alleged trade secrets to Wiley and to Dotzenroth without any "proprietary" or "confidentiality" indicators on them. (*Id*.) Defendants also allege that Plaintiff Tarpley continued to send Dotzenroth purportedly secret information even after Tarpley had parted ways with Dotzenroth, therefore he could not have had any possible expectation of confidentiality. (*Id*.)

The record before the Court indicates that neither Wagner nor Tarpley took consistent measures to protect the purportedly valuable trade secrets. Although Tarpley stated that he and Wagner "had potential investors, partners, and customers sign non-

disclosure agreements ('NDAs') and that the business plan was stamped 'PROPRIETARY,'" the evidence shows that Tarpley emailed Dotzenroth the following documents with no NDA in place, and no markings on the documents indicating they were confidential or proprietary: Program Development Schedule, Payload Range Capability, work schedules, Business Plan, slide presentation (Def. Ex 1-5, 8, 9, 21 [ECF No. 199.]

In addition, Defendants submitted evidence that Tarpley emailed the business plan to Steve Yeager, who was not bound by any NDA. (Supp. Ev. at 1 [ECF No. 250.] On September 6, 2020, Tarpley texted Yeager at approximately 2 pm, and said, "Ok. I think we need to get through next Thursday's meetings to know we are a go. I can send you the business plan -52 pages." (Id. at 7). He follows at 6:34 P.M., "Sent you a big file via email." To which Yeager responds, "I have it ... Thank you." (*Id*. at 8). On September 8, 2020, Tarpley texted Yeager again asking, "Did you get a chance to look at the presentation?" (*Id*.) Yeager responded, "I looked through it the other day. I plan to go back through in more detail one night this week." (*Id*.)

On October 11, 2021, Tarpley texted Yeager stating "You may get a call from Eric Nitz, our attorney, asking you if you understood the business plan I sent you for Mammoth was confidential and if you sent it to anyone else. Of course it was confidential but I never asked you to sign an nda." (*Id*. at 10). The disclosure of purported trade secrets to outside parties with no NDA or other indicia of secrecy on the documents suggests that the information was not truly secret. *Ruckelshaus*, 467 US. at 1002. In addition, Wagners's text to Yeager claiming the prior disclosure was confidential is an after the fact effort to claw back the disclosure of information which is insufficient to demonstrate genuine efforts to keep the information secret.

In an effort to explain that the disclosures did not compromise the secrecy of the information, Plaintiffs allege that most of the disclosures were made to Tarpley's friends, family, and business associates under a mutual understanding of confidentiality and that potential customers were bound by ethics policies, or the documents were stamped

1    proprietary. (Reply at 13). Such disclosures for a limited purpose to a customer or
2    investor does not extinguish trade-secret status, according to Plaintiffs. (*Id.*)

3         Wagner disclosed the information to a potential business partner with only the
4    assurance that their employee was bound by their ethics policy requiring the
5    representative to maintain the confidentiality of non public information. This does not
6    ensure secrecy the way an NDA would for purportedly valuable information. However, if
7    a jury determined that there was an implied relationship of confidentiality between
8    Wagner and the potential business partner, the ethics policy could constitute reasonable
9    efforts to maintain secrecy. *See DirectTechnologies v. Electronic Arts*, 836 F.3d 1059,
10   1070 (9th Cir. 2016)("It may be that in some factual circumstances, a rational jury could
11   find that when an implied relationship of confidentiality exists between two business
12   partners, it is 'reasonable under the circumstances' for the prospective seller to not make
13   additional efforts to maintain secrecy.")

14        The facts before the Court indicate that Plaintiffs did not consistently protect the
15   secrecy of the alleged trade secrets as some copies of the documents included
16   "proprietary" stamps, while others had no indicia of secrecy. This is insufficient to
17   demonstrate Plaintiffs took reasonable efforts to protect the secrecy of the documents and
18   information for purposes of this request for injunctive relief. *Ruckelshaus*, 467 U.S. 986,
19   1011 (1984)("Once the data that constitute a trade secret are disclosed to others, or others
20   are allowed to use those data, the holder of the trade secret has lost his property interest in
21   the data.")

22
23                              *b.  Economic Value*

24        In addition to taking reasonable measures to ensure the secrecy of the information,
25   the holder of a trade secret must also show that the information has independent
26   economic value that derives from not being generally known. *See* 18 U.S.C. §
27   1839(3)(A). Plaintiffs argue that the time and resources Wagner expended demonstrate
28

the economic value of the information. (Mot. at 10). They contend more than $1 million in Wagner Aeronautical time in the course of about 18 months was spent developing the conversion plan documents listed as trade secrets. (*Id*.) Defendants counter that Plaintiffs "dramatically exaggerate the time and effort spent on their business plan" noting that the evidence suggests it was closer to three weeks. (Dotzenroth Oppo. at 21).

The facts illustrate that both parties found economic value in the documents, as both used them to further the discussions with each other, and outside parties, to garner investment backing and general support. However, the fact that Plaintiffs divulged the alleged trade secrets without attempting to consistently protect them counsels against finding economic value, as "[a] trade secret's value is the competitive advantage it gives its owner." *Ruckelhaus*, 467 U.S. at 1011. The independent economic value of trade secrets derives from their secrecy. *U.S. v. Chung*, 659 F.3d 815, 825 (9th Cir. 2011). As noted above, Plaintiffs made inconsistent efforts at protecting the purported trade secrets, and disclosed them to individuals with no known connection to the business endeavor, in addition to others. For purposes of the present preliminary injunction motion, the Court finds that any economic value the trade secrets had was diminished by the disclosure of them without efforts to protect their secrecy. Consequently, trade secret ownership has not been sufficiently demonstrated by Plaintiffs. For the reasons discussed above, the Court finds that Plaintiffs failed to establish ownership of the trade secrets. However, even if Plaintiffs can demonstrate ownership of the alleged trade secrets, they cannot demonstrate a likelihood of success on the merits for the following reasons.

## 2. *Misappropriation*

Trade secret misappropriation includes "disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5)(A). Such disclosures are unlawful when they are made "by a person who at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was acquired under

circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret. *Id*.; *see* Cal.Civ.Code §3426.1(b).

Injunctive relief is warranted, according to Plaintiffs, because Defendants used and disclosed Plaintiffs' trade secrets to third parties without authorization. (Mot. at 13). Specifically, Plaintiffs claim that Dotzenroth emailed the business plan and trade secrets to NIAR Defendants Jones, Kivett, Wiley Dotzenroth, and Andy Mansell, a conversion marketer in February 2020, among others. (*Id*. at 14).  Plaintiffs claim that Defendants agreed to keep the trade secrets confidential, or at a minimum had an implied duty of confidentiality.  (*Id*. at 16-18).

The Dotzenroth Defendants counter that Plaintiffs shared their data with no NDAs in place, emailing them to Dotzenroth and Wiley as they hammered out the details of the possible business venture. (Oppo. at 14).  Plaintiff Tarpley continued to send purportedly secret information to Dotzenroth even after May 2019, when the parties went their separate ways.  (*Id*.) The fact that Wagner entered into NDAs with outside parties did not govern the relationship between Dotzenroth and Plaintiffs, according to Defendants. Moreover, Wagner knew that Defendants were using the allegedly secret materials in discussions with NIAR when he attended meetings at NIAR, expressing hope that the NIAR/KMC business would include him, yet he did nothing to stop the dissemination of the information at that time. (*Id*. at 16).  Dotzenroth argues that there was never an agreement between Wagner, Tarpley and Dotzenroth that the information could only be used to benefit Tarpley and Wagner, and if the information was so valuable, they would have protected it with NDAs. (*Id*. at 17). There was no implied duty of confidentiality either, according to Dotzenroth Defendants, because no inference of confidentiality is warranted where a plaintiff broadly discloses its supposed trade secrets. (*Id*. at 18-19).

As with many business relationships, the parties in this case began discussions with high hopes for future success. The parties were operating in a highly competitive market and there is evidence that they were not working in concert at various points. Tarpley formed Mammoth, the corporation that would be responsible for the Conversion Program, without Wagner. Dotzenroth developed a plan to approach the Wichita State University in Kansas to provide financial backing and resources, and Wagner was included in the development of that plan, but he ultimately did not become a partner to the venture. When the relationship ruptured, the individuals began leveling serious allegations at each other.[1]

The facts as gleaned from competing declarations indicate that Wagner, Tarpley, and Dotzenroth shared ideas, information, and resources liberally with each other in developing the business plan and "roadmap" for the conversion program, sometimes with markers of confidentiality, and sometimes without. Dotzenroth stated that:

> Tarpley, Wagner, and I never agreed that the information we shared and the business plan that resulted from that sharing was required to be kept confidential by any one or all of us. NDA's are standard practice in the aviation industry, so if Tarpley or Wagner believed any of the information related to the potential 777 conversion was confidential, or constituted proprietary information belonging to them, they would have protected that information with an NDA with me. Because I was never bound by an NDA or other agreement defining ownership of any intellectual property or information shared amongst Tarpley, Wagner, and myself, I considered myself free to use that information for my own benefit once our attempt to start a business unraveled, just as Tarpley and Wagner used it for their own benefit.

(Dotzenroth Dec. at ¶ 9)

In contrast, William Wagner explained that he and William Tarpley "considered the information and data contained in the business plan and roadmap to be proprietary

---

[1] The Parties have made serious accusations of dishonesty, doctoring documents, paying bribes, and other malfeasance against each other. The Court will not engage in determining credibility of these allegations at this stage in the proceedings.

13

and highly confidential." (Wagner First Supp. Dec. at ¶2 [ECF 161-3.]) Both Wagner and Tarpley stated that Wagner, Tarpley and Dotzenroth agreed to keep the information about the conversion program confidential, using them only to obtain financing for Plaintiffs' program. (Mot. at 17). Wagner stated that he told Dotzenroth as much in a May 21, 2019 text that read "Please remember that the schedule, budget and man loading info is proprietary." (*Id*.)  According to Wagner, he participated in meetings with Dotzenroth at NIAR, but he did not authorize David or Wiley Dotzenroth to use the "information in the business plan and roadmap in connection with those meetings." (*Id*. at ¶ 3).

The record demonstrates that both parties shared the information claimed to be trade secrets without NDA's in place, or other indicators of secrecy and ownership, at various times in efforts to promote the conversion plan and secure funding. The parties agree there was no formal arrangement between them, though it appears that details about profit sharing and distributions were almost settled when the relationship soured. Plaintiffs note many instances of disclosure by Dotzenroth to various NIAR Defendants as evidence of misappropriation, however, Wagner knew that the information was being disseminated in an effort to advance the NIAR relationship, and attended a meeting in Kansas with NIAR to that purpose, even seeking to be included in the NIAR conversion program. In fact, Wagner and Wichita State University, NIAR's partner, entered into an NDA in March 2020 to discuss a potential collaboration related to the 777 conversion plan. (NIAR Oppo. at 18).  NIAR Defendants David Jones and Ronald Towry flew to Wagner Aerospaces' offices for further discussion in September 2020, but according to NIAR, Wagner failed to demonstrate he owned the 757 conversion material as he claimed, and Wagner made clear that nothing discussed in the meeting was confidential or proprietary. (*Id*. at 7). NIAR decided to pursue its program without Wagner, concerned that Wagners small facilities and limited staff could not deliver on the 757 conversion program. (*Id*.)

14

Plaintiffs argue that there was an implied duty of confidentiality between the Parties, however, Defendants have stated they were not on notice that the information was confidential. "[C]ourts will consider the factual circumstances of each case on an individual basis, to determine whether a confidential relationship may reasonably be implied." *Pachmayr Gun Works v. Olin Mathieson Chem. Corp*., 502 F.2d 802, 808 (9th Cir. 1974).   "An implied duty of confidentiality is found when the other party has reason to know that the information was in fact confidential." *Carr v. AutoNation*, 798 Fed.Appx. 129, 130 (9th Cir. 2020) "[N]o duty of confidence will be inferred unless the recipient has notice of the confidential nature of the disclosure." *See* Restatement (Third) of Unfair Competition § 41 cmt. b (Am. Law Inst. 1995).

The limited facts before the Court in this request for injunctive relief indicate that there are serious questions going to the merits regarding whether Defendants "knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret."  18 U.S.C. § 1839(5)(A). Moreover, the after- the- fact text message from Wagner to Dotzenroth stating that the documents were confidential is insufficient in light of the numerous instances of non-protected disclosures made by Plaintiffs themselves.

### B.  Irreparable Harm

Plaintiffs argue that they will be irreparably harmed if they are not granted injunctive relief to protect their trade secrets, contending that disclosure of trade secrets to competitors constitutes irreparable harm on its own.  (Mot. at 20).  Loss of customers to a competitor due to trade secret misappropriation also constitutes irreparable harm, according to Plaintiffs. (*Id*. at 20-21).  Plaintiffs claim they will suffer irreparable harm because the theft of their trade secrets "dramatically accelerated Defendants' competing P2F program" and as a result Defendants are able to compete for the same small pool of customers in a "zero-sum market." (*Id*. at 20). For example, Plaintiffs note that they have

15

already lost one customer because the first 777 aircraft has arrived at NIAR and KMC for conversion. (Id. at 21).  Plaintiffs explain their delay in filing for injunctive relief by stating it was not until the public announcement in February 2021 that they realized the competing conversion program posed a real risk, at which time they decided to try to protect the alleged trade secrets.  They also explain that they waited to file until the possibility of irreparable harm ripened into a likelihood and argue that they are seeking injunctive relief based on "ongoing, worsening injuries" (Reply at 21).

No presumption of irreparable harm should be made in trade secret cases, according to Defendants. (Dotzenroth Defendants Oppo. at 24). Defendants claim that the two- year delay in filing the preliminary injunction, indicates that there is no danger of irreparable harm to Plaintiffs. (NIAR Def. Oppo. at 20; Dotzenroth Def. Oppo. at 22).  If Plaintiffs request was granted, Defendants contend that it would stop the NIAR/KMC conversion program that has been operating for over two years with Plaintiffs' knowledge which would not serve the purpose of a preliminary injunction to preserve the status quo. (*Id*. at 23).

Plaintiffs have not shown they will suffer irreparable harm in the absence of an injunction. First, it is not certain that the trade secrets at issue are protectable, but even if this case involves trade secrets, the Court is not required to presume irreparable harm because of alleged trade secret loss. *Calence, LLC v. DimensionData Holding, PLC*, 222 Fed.Appx.563, 566 (9th Cir. 2007).

Second, Plaintiffs' delay in seeking injunctive relief weighs against a finding of irreparable harm. The facts indicate they knew as early as 2019 that Defendants began distributing allegedly proprietary information but Plaintiffs did not seek injunctive relief for over two years. The original complaint was filed on May 25, 2021 and Plaintiffs filed a motion for preliminary injunction on June 21, 2021, which was withdrawn on July 8, 2021.  Plaintiffs waited another six months before filing the present motion on December

16

21, 2021. Tarpley was also on notice from at least early 2020 that Dotzenroth had formed a new company, relying in part on "the information from the business plan that Wagner and I had developed."  (Tarpley Dec. Ex 27 ¶ 18 [ECF No. 163-3.])

A plaintiff's failure to seek judicial protection can imply "'the lack of need for speedy action,' *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014).  "Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *See Oakland Tribune, Inc. v. Chronicle Publ'g Co*., 762 F.2d 1374, 1377 (9th Cir.1985); *iFreedom Direct Corp. v. McCormick*, 622 Fed.Appx.550, (9th Cir. 2016)("ten-month delay  in seeking a preliminary injunction undermined [plaintiff's] claim of irreparable harm.")  Here, Plaintiffs did not act with sufficient urgency to protect the trade secrets, indicating they will not be irreparably harmed if no injunctive relief is granted.

Plaintiffs claim that "delay is but a single factor to consider in evaluating irreparable injury" where plaintiffs suffer "ongoing, worsening injuries" citing  *Arc of California v. Douglas*, 757 F.3d 975 (9th Cir. 2014). However, they do not demonstrate "ongoing, worsening injuries" sufficient to justify the delay. In *Arc*, "non-profit organizations sought a preliminary injunction enjoining California's reduction in its reimbursement for services provided to developmentally disabled individuals under the Medicaid program." *Id.* at 979. The appellate court reversed the district court's denial of a preliminary injunction, noting that "the alleged injuries resulted from various cuts in compensation, enacted over a period of time and having a cumulative impact. In such circumstances, the magnitude of the potential harm becomes apparent gradually, undermining any inference that the plaintiff was "'sleeping on its rights.'" The Court noted that the delay in seeking injunctive relief was offset by "ongoing, worsening injuries," making it only one factor to consider in the determination.  *Id*. at 990. Here, Plaintiffs have not sufficiently demonstrated that they are suffering from ongoing and

worsening harm as a result of the alleged misappropriation by Defendants of their trade secrets for purposes of this motion.

Instead, the Court finds that the delay of almost two years before filing the initial preliminary injunction indicates Plaintiffs will not be irreparably harmed in the absence of injunctive relief.

### C. Balance of Equities

"To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. Hawaii Prof. Assembly v Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999).   The party seeking a preliminary injunction "must establish ... that the balance of equities tips in his favor." *Winter*, 129 S.Ct. at 374. A district court has a "duty ... to balance the interests of all parties and weigh the damage to each" in determining whether a party has met this burden.  *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir.1980). In balancing the relative hardships to the parties the court may weigh the relative size and strength of the parties to determine the respective ability to endure the potential hardship. *Sardi's rest. Corp. v. Sardie*, 755 F.2d 719, 726 (9th Cir. 1985).

Plaintiffs claim they have invested thousands of hours tailoring their decades of experience into the conversion program which would be unfairly diminished in the absence of an injunction. (Mot. at 24). The Dotzenroth Defendants counter that Plaintiffs and Fortress Investments, the $54 billion private equity firm that owns and funds Plaintiffs, have attempted to destroy the Dotzenroth Defendants financially through this litigation. (Oppo. at 25).  The NIAR Defendants contend that Plainitffs are seeking to enjoin the use of broad, ill-defined trade secrets, but they are not entitled to such an injunction because it is not tailored to remedy the specific harm alleged citing *E.Bay Sanctuary Covenant v. Barr,* 934 F.3d 1026, 1029 (9th Cir. 2019). (NIAR Oppo. at 24).

In the present case, Plaintiffs assert they have lost business in a highly competitive market through Defendants' use of their information, which indicates that a preliminary injunction could balance the scales by stopping the use of those secrets in the conversion program that is in progress. However, the lucrative backing of Fortress suggests that Wagner and Tarpley have plentiful resources to continue to develop competing conversion programs, utilizing the information they have developed. In contrast, the issuance of a preliminary injunction would halt the NIAR conversion program and cause unemployment, lost income, and delay the delivery of important cargo aircraft. These interests weigh heavily in favor of not granting injunctive relief, and tip the balance to the Defendants.

### D. Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 376-77, *citing Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). "'The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff . . . (but is rather) a matter of sound judicial discretion . . .' and careful balancing of the interests of the respective parties.'" *Friends of the Earth v. Coleman*, 518 F.2d 323, (9th Cir. 1975)(citing *Yakus v United States*, 321 U.S. 414, 440 (1944).

Plaintiffs contend that a preliminary injunction will serve the public interest in protecting trade secrets as an investment in innovation. (Mot. at 24). This is particularly true in the P2F industry because the public has become increasingly dependent on air-freight shipping including the delivery of groceries, medication and other necessities. (*Id*.) The public therefore has a strong interest in "ensuring ingenuity and creativity in the air-cargo industry." (*Id*. 24-25).

The Dotzenroth Defendants do not address this factor, but the NIAR Defendants contend that the mission of both WSU and NIAR is to serve as an "educational, cultural

and economic driver for Kansas and the Wichita community" and the 777 Conversion Program supports this mission by employing a substantial number of Wichita residents. (NIRA Def. Oppo. at 24).  An injunction that affects NIAR's ability to support the 777 Conversion Program would impact WSU, the Wichita community, and the State of Kansas which has recognized the importance of the aerospace industry in its growth. (*Id*.)

Preserving and protecting innovation in the air cargo industry is clearly in the public's interest, and for that very reason, the issuance of a preliminary injunction would not be in the public interest because it would mean the cessation of NIAR's involvement with the 777 Conversion Program which has been operating for over two years. The impact to WSU, NIAR and the Wichita community would be tremendous, and weighs heavily in favor of denying injunctive relief.  (Kuwayti Dec. Ex A-E [ECF No. 196-1.]) Kansas boasts a long history of aviation manufacturing, and "the KMC, in partnership with Wichita State University's National Institute for Aviation Research (NIAR) WERX program, will help solidify the Wichita area as a leader in the maintenance, repair, and overhaul (MRO) industry." (*Id*. Ex B at 15).  In light of the above, an injunction that has the effect of preventing the operation of the conversion program in Kansas would not be in the public interest.

III.    CONCLUSION AND ORDER

For the foregoing reasons, the Court VACATES the prior sealed ORDER [ECF No 373], files this AMENDED ORDER DENYING Plaintiffs' motion for preliminary injunction [ECF No. 161], DENIES Defendants' request to file supplemental briefing as moot [ECF No. 218], and DENIES Defendants' ex part request to file a redacted order as moot [ECF No. 376.]

**IT IS SO ORDERED**

Dated:  October 7, 2022

Hon. M. James Lorenz
United States District Judge

20